UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

KYLE COLEY                          )
and MATTIE COLEY                    )
                                    )        Case No. 3:26-cv-00007-GFVT
        Plaintiffs,                 )
                                    )
V.                                  )        **MEMORANDUM OPINION**
                                    )        **&**
T.T. OF F. FRANKFORT, INC., *et al.,*  )     **ORDER**
                                    )
        Defendants.                 )

*** *** *** ***

This matter is before the Court on the Defendants' Motions to Compel Arbitration and Dismiss this action.  [R. 3; R. 5.]  The Court, having reviewed the record and for the reasons set forth herein, will **GRANT** Defendant T.T. of F. Frankfort's Motion to Compel Arbitration **[R. 3]** and **GRANT** Defendant Commonwealth Federal Credit Union's Motion to Compel Arbitration. **[R. 5.]**  However, the Court will **STAY** this action, rather than dismiss it.

**I**

In the spring of 2025, with their eighth child on the way, Plaintiffs Kyle Coley and Mattie Coley sought to purchase a vehicle that would comfortably fit their family of ten.  [R. 1-1 at 6.] The Coleys arrived at T. T. of F. Frankfort, doing business as Gary Yeomans Ford Frankfort, a car dealership, and originally settled on purchasing 2022 Ford Transit Passenger Wagon.  *Id.* The Coleys initially planned to finance the purchase of their vehicle through a third-party lender, but decided instead to finance through Gary Yeomans recommended lender, Defendant Commonwealth Federal Credit Union.  [R. 9 at 2.]  However, prior to completing the sale, the Coleys noticed that the mileage on the 2022 Ford Transit exceeded the mileage they were comfortable with.  [R. 1-1 at 6.]

Later that day, Gary Yeomans offered the Coleys an alternate vehicle, a 2024 Ford Transit Passenger Wagon, with far fewer miles accumulated. *Id.* at 7. The Coleys agreed to the sale and as part of the purchase, signed a Bill of Sale which contained an arbitration provision. [R. 3-2.] The Coleys also signed a Retail Installment Contract and Security Agreement, which related to the financing of the vehicle. [R. 9-1.] The Retail Installment Contract did not include an arbitration provision. *Id.* Gary Yeomans then assigned this Retail Installment Contract to Commonwealth Federal Credit Union, and the Coleys signed a Member Service Agreement with Commonwealth Federal Credit Union. [R. 5-1.] The Member Service Agreement also contains an arbitration provision. *Id.* at 31-32.

The Coleys took possession of the 2024 Ford Transit on May 19, 2025. [R. 1-1 at 7.] Subsequently, the Coleys allege that Gary Yeomans asked them to sign a different contract, and while reviewing that contract, the Coleys claim they learned information about the vehicle that was unknown to them at the time of purchase. *Id.* at 8. Specifically, the Coleys claim that Gary Yeomans represented to them that it previously used the vehicle as a company shuttle for employees, but the Coleys believe the vehicle was actually used as rental vehicle. *Id.* Further, when the Coleys purchased the vehicle, they were under the impression that the vehicle met the "Ford Blue-Advantage Gold Certified" standard, but the new contract did not contain this assurance. *Id.* Additionally, the Coleys believe they were overcharged for the vehicle, and entered into a contract for a price higher than what they had agreed to. *Id.* at 9.

In light of the foregoing, the Coleys returned the vehicle to Gary Yeomans on June 13, 2025. *Id.* The Coleys allege that they have sought to purchase a new vehicle and believe that their credit scores have been negatively affected as a result of their dealings with Gary Yeomans and Commonwealth Federal Credit Union. *Id.* at 10. Thus, the Coleys initiated this action in

2

Franklin Circuit Court, bringing claims for Failure to Honor the Revocation of Acceptance, Fraud and Intentional Misrepresentation, Defamation and Slander of Credit, as well as violations of the Kentucky Consumer Protection Act, the federal Truth in Lending Act and the federal Fair Credit Reporting Act. *Id.* at 11-23.

The Defendants removed the action to this Court on January 23, 2026, invoking its federal question jurisdiction and supplemental jurisdiction. [R. 1 at 4.] Subsequently, the Defendants each filed a "Motion to Dismiss and Motion to Compel Arbitration." [R. 3; R. 5.] Although styled as both a motion to dismiss and a motion to compel arbitration, neither Defendant challenges the sufficiency of the Complaint. *See id.* Thus, the Court construes both motions as only motions to compel arbitration. The Coleys oppose arbitration, and in the alternative, ask the Court to stay the action, rather than dismiss it, if it finds the claims subject to arbitration. [R. 9; R.11.] The matter has been fully briefed and is ripe for review.

## II

The Federal Arbitration Act "establishes a liberal policy favoring arbitration agreements." *Parker v. Tenneco, Inc.*, 114 F.4th 786, 792 (6th Cir. 2024) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018)). "This policy is not an open invitation for the Court to 'devise novel rules to favor arbitration over litigation,' but rather an 'acknowledgement of the FAA's commitment … to place [arbitration] agreements upon the same footing as other contracts." *Johnson v. HCL Am., Inc.*, 817 F.Supp.3d 445, 449 (E.D. Ky. 2025) (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022); *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 302 (2010)). Where a valid arbitration agreement exists, a party can seek to compel arbitration, and stay the case in the interim, pursuant to the Federal Arbitration Act. 9 U.S.C. §§ 3-4.

3

This presumption, however, is not boundless.  Relevant here, the "presumption in favor of arbitration," relates only to the scope of valid, existing arbitration agreements; it does not mean there is a presumption when addressing whether the parties entered into a valid agreement to arbitrate in the first place.  *Southard v. Newcomb Oil Co.*, LLC, 7 F.4th 451, 454 (6th Cir. 2021) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302-03 (2010)).  Rather, in following the Federal Arbitration Act's stated purpose of placing arbitration agreements on the same footing as other contracts, questions about the formation of an arbitration agreement are resolved by reference to principles of standard contract law.  *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-44 (1995); *see also Hergenreder v. Bickford Senior Living Grp., LLC*, 56 F.3d 411, 416-17 (6th Cir. 2011) (same).

The Sixth Circuit has determined that district courts addressing a motion to compel arbitration must engage in a three-step analysis.  It "must assure itself that (1) the parties agreed to arbitrate; (2) the claims asserted fall within the scope of the arbitration agreement; and (3) Congress did not intend for those claims to be non-arbitrable." *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 375 (6th Cir. 2026) (quoting *Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 404 (6th Cir. 2025)).  As to both Motions, the Coleys only dispute whether they entered into a valid arbitration agreement with both of the Defendants.

A

Beginning with Defendant Gary Yeomans Ford Frankfort's Motion, it contends that the Coleys entered into a binding arbitration agreement by signing the Bill of Sale to purchase the 2024 Ford Transit.  [R. 3-1 at 2-4.]  The Bill of Sale references arbitration in two separate

4

locations.  The second page of the agreement contains a box titled "Agreement to Arbitrate" in bold, centered font.  [R. 3-2 at 3.]  This box reads:

> This Agreement includes an Arbitration Provision that affects your rights. It provides that you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. By signing this Agreement to Arbitrate section, you confirm that you read, understand, and agree to this Agreement's Arbitration Provision.

*Id.*  The Coleys signatures are located immediately below this sentence.  *Id.*  Then, on the fourth page of the agreement, the top of the page reads, in capitalized and bold font "ARBITRATION PROVISION."  *Id.* at 5.  The provision then provides, in relevant part:

> Any claim or dispute, whether in contract, tort, statute, or otherwise. . .between you and us or our employees, agents, successors, or assigns, which arises out of or relates to your credit application, purchase or condition of this Vehicle. . .shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action.

*Id.*

As noted above, the Court must determine (1) whether the parties agreed to arbitrate, (2) whether the dispute falls within the scope of the agreement, and (3) whether Congress intended any of the federal claims to be nonarbitrable.  *Glazer v. Lehman Bros., Inc.,* 394 F.3d 444, 451 (6th Cir. 2005) (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)).  The central dispute concerns the first element, whether the parties agreed to arbitrate, but the Court will first address the second and third elements, in the interest of thoroughness.

The Coleys do not contend that their claims fall outside the scope of the arbitration provision.[1]  For good reason, because all of their claims clearly arise out of either their credit application with Gary Yeomans or their purchase of the vehicle.  *See U.S. ex rel. Paige v. BAE*

---

[1] The Coleys do state that the Arbitration Agreement "falls outside the scope of the *FAA*."  [R. 9 at 5 (emphasis added).]  The Court will address this argument in due course, but the Coleys do not assert that their claims fall outside the scope of the *Agreement*.  *See id.*

*Sys. Tech. Sols. & Servs., Inc.*, 566 F. App'x 50, 503 (6th Cir. 214) ("In determining whether a claim falls within the scope of an arbitration clause, we look to the plain language of the agreement."). Thus, the Coleys claims all fall within the scope of the arbitration provision contained in the Bill of Sale.

Further, the Coleys do not assert that Congress intended their federal claims to be nonarbitrable. The federal claims brought by the Coleys include claims for violations of the Truth in Lending Act and the Fair Credit Reporting Act. [R. 1-1 at 20-23.] The Supreme Court has held that Truth in Lending Act claims are arbitrable, and courts within the Sixth Circuit regularly compel arbitration of Federal Credit Reporting Act claims as well. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000) (holding that the party opposing arbitration had not demonstrated that Congress intended to preclude arbitration of Truth in Lending Act claims); *see also Mason v. Version Wireless Servs., LLC*, 806 F.Supp.3d 703, 710 (N.D. Ohio 2025) (collecting Sixth Circuit cases compelling arbitration of FCRA claims).

Turning to the central dispute, whether the parties agreed to arbitrate, under Kentucky law, "[t]he essential elements of a valid contract are an offer and unequivocal acceptance, a certain and complete recitation of the material terms, and consideration." *Britt v. Univ. of Louisville*, 628 S.W.3d 1,5 (Ky. 2021) (citing *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. 1953). Chiefly, the Coleys argue that the Bill of Sale was not effective between the parties and thus cannot serve as the basis for an agreement to arbitrate. [R. 9 at 2.] Put simply, the Coleys argue that the only contract between themselves and Gary Yeomans was the Retail Installment Contract, which did not contain an arbitration provision. *Id.*

The Coleys note that when they first arrived at Gary Yeomans to purchase the vehicle, they had secured third-party financing through Navy Federal Credit Union. *Id.* Thus, the Coleys

6

state that they executed the Bill of Sale for the sole purpose of providing it to the third-party lender. *Id.* at 4. To that end, the Coleys argue that once they agreed to finance the vehicle through Gary Yeomans, rather than the third-party lender, the Bill of Sale no longer served any purpose, and the Retail Installment Contract became the operative agreement between the parties. *Id.* The Coleys contend that the Retail Installment Contract provides all of the essential terms of the agreement and, in turn, makes the Bill of Sale ineffective. *Id.*

It appears that the Coleys are attempting to assert an implied novation theory whereby the execution of a new contract relieves the parties of their obligations under the prior contract. A novation occurs when parties enter into a new contract which replaces an old contract and extinguishes the rights and duties of the parties under the prior contract. *See White/Reach Brannon RD., LLC v. Rite Aid of Ky., Inc.*, 488 S.W.3d 631, 637-38 (Ky. App. 2016) (citing *Combs v. Morgan*, 211 S.W.2d 821, 825 (1948)). A novation can occur by express terms, if the new contract explicitly rescinds the prior contract, or by implication, where the new contract contains terms that are inconsistent with the prior contract. *Id.* As such, while it is true that when presented with two agreements between parties concerning the same matter, the later agreement will govern, that is only to the extent that the language of the contracts conflict with one another. *See Coal-Mac, LLC v. Blair*, 2021 WL 4484987, at *2 (Ky. App. Oct. 1, 2021).

In *Coal-Mac*, the Kentucky Court of Appeals considered whether the parties remained bound by the arbitration provision contained in an employment agreement, when the parties had later executed an agreement which directed the parties to court in the event of a dispute. 2021 WL 4484987, at *2. The Court held that the later agreement's dispute resolution provision governed because the conflict between the later agreement's language was "manifestly in place of or inconsistent" with the prior agreement. *Id.* (quoting *Rite Aid*, 488 S.W.3d at 636-37). Put

7

simply, the terms in the agreements could not be reconciled with one another because claims cannot "simultaneously proceed before both" an arbitrator and a Court. *Coal-Mac*, 2021 WL 4484987, at *2. Thus, the Court held that terms of the later contract controlled and upheld the lower court's denial of the motion to compel arbitration. *Id.* at *3.

In the present case, the Retail Installment Contract does not contain any express novation clause purporting to discharge the rights and duties of the parties under the Bill of Sale. [*See* R. 9-1.] Nor are the two documents inconsistent with one another such that performance of the Bill of Sale became impossible when the parties executed the Retail Installment Contract. *See Rite Aid*, 488 S.W.3d at 636-37. To the extent that these agreements impose conflicting obligations on the parties, with respect to the arbitration issue, the Retail Installment Contract makes no mention of dispute resolution, so there is simply no conflict to speak of. [*See* R. 9-1.] Further, the Coleys have provided no reason why either party could not comply with the terms of both the Bill of Sale and the Retail Installment Contract. Thus, the Bill of Sale's arbitration provision remains in effect.

The Coleys also seem to argue that because the underlying contract, the Bill of Sale, did not have any independent significance after the parties executed the Retail Installment Contract, the arbitration provision contained therein is no longer in effect. [R. 9 at 4.] However, this argument rests on a faulty premise because the arbitration provision itself is a binding contract between the parties, even if the remainder of the contract no longer served any purpose. As noted above, the fundamental elements of a valid contract are "offer and acceptance, full and complete terms, and consideration." *Commonwealth v. Morseman*, 379 S.W.3d 144, 149 (Ky. 2012) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002)). The Arbitration Agreement in the Bill of Sale contained all of these elements.

8

Taking the arbitration provision in the Bill of Sale in isolation, the Coleys clearly assented to the terms by placing their signature under a sentence that reads, "By signing this Agreement to Arbitrate section, you confirm that you read, understand and agree to this Agreement's Arbitration Provision." [R. 3-2 at 3.] They do not contend otherwise. Further, the Arbitration Agreement was independently supported by consideration: the parties each gave up their right to proceed in court and gained the ability to elect arbitration in the event that a dispute arose between the parties. *Energy Home, Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (quoting *Kruse v. AFLAC Intern., Inc.*, 458 F.Supp.2d 375, 385 (E.D. Ky. 2006)) ("[A]n arbitration clause requiring both parties to submit equally to arbitration constitutes adequate consideration."). At bottom, arbitration agreements do not necessarily depend on the underlying contract having any independent significance because they are binding in their own right. As such, the Arbitration Agreement constitutes a valid agreement between the parties, independent of the Bill of Sale.

Finally, the Coleys argue that the Arbitration Agreement in the Bill of Sale falls outside the scope of the Federal Arbitration Act. [R. 9 at 5.] The Coleys reason that "consumer arbitration provides arbitration in name only," and assert that once a party substantiates that arbitration will not afford them an adequate opportunity to vindicate their claims, "then it is not arbitration." *Id.* The Coleys provide the Court with an article published by the American Arbitration Association, as well as an article written by the Vice Present of the American Arbitration Association, which the Coleys believe definitively proves that they will be subjected to an unfair process if directed to arbitration. *Id.*

While these articles may provide some context to the motivation behind the Coleys opposition to arbitration, they are not particularly relevant to the resolution of Gary Yeomans'

motion. As the Coleys point out, the Federal Arbitration Act provides a remedy for parties subjected to unfair arbitration procedures. Under the Federal Arbitration Act, a party may move to vacate an arbitral award under circumstances provided for in the Act. 9 U.S.C § 10(a)(1)-(4). However, this mechanism necessarily must take place after arbitration has occurred and does not serve as a basis for an unwilling party to avoid arbitration outright.

For the foregoing reasons, the Coleys' claims against Gary Yeomans are plainly subject to arbitration. The Coleys agreed to arbitrate claims arising out of their credit application and purchase of the 2024 Ford Transit by assenting to the Bill of Sale, all of their claims fall within the scope of that agreement, and Congress did not intend for their federal claims to be nonarbitrable. Accordingly, the Court will grant Defendant Gary Yeomans Ford Frankfort's Motion to Compel Arbitration as to all of the Coleys' claims. [R. 3.]

**B**

Turning next to Defendant Commonwealth Federal Credit Union's Motion, it asserts that the Coleys, in conjunction with the assignment of their Retail Installment Contract to Commonwealth, entered into a Member Service Agreement containing a broad arbitration provision and asks this Court to honor that Agreement. [R. 5 at 4.] Just as before, the Court must determine (1) whether the parties agreed to arbitrate, (2) whether the dispute falls within the scope of the agreement, and (3) whether Congress intended any federal claims to be nonarbitrable. *Glazer*, 394 F.3d at 451 (quoting *Stout*, 228 F.3d at 714). In harmony with their opposition to Gary Yeomans' motion, the Coleys similarly only challenge the first element with respect to Commonwealth Federal Credit Union's motion. However, the Court will briefly address the second and third elements as well.

Commonwealth provides a two-part document, the Member Service Agreement, as the basis for its motion to compel arbitration.  [*See* R. 5-1.]  Part One of the Agreement contains basic information about the Coleys and displays their signatures at the bottom of the page.[2]  *Id.*  Prior to their signatures, the Agreement provides that by signing Part One of the Agreement, the signatories "acknowledge receiving or being offered Part 2" of the Membership Services Agreement which, along with other specified documents "comprise the terms of the Membership Services Agreement."  *Id.*  Part One also states "[b]y signing this Part 1. . .you agree to the MSA."  *Id.*

Part Two of the Agreement outlines the terms of the Coleys relationship with Commonwealth and conspicuously includes an arbitration provision.  [R. 5-1 at 31-32.]  The beginning paragraph of the arbitration provision sports all capitalized font and advises the reader that arbitration "replaces the right to go to court."  *Id.* at 31.  Under the Section titled "Agreement to Arbitrate Dispute," the Agreement reads:

> Either you or we may elect, without the other's consent, to require that any dispute between us concerning the account(s) you have with us and the services related to the account(s) to be resolved by binding arbitration, except for those disputes specifically excluded below. This arbitration agreement is entered into pursuant to the Federal Arbitration Act 9 U.S.C. §§ 1-16 ("the FAA")

*Id.* at 32.  Then, under the section titled "Disputes Covered by Arbitration," the Agreement reads:

> Claims or disputes between you and us arising out of or relating to the account(s) you have with us, transaction involving the account(s), safe deposit box, and any related service with us are subject to arbitration. Any claims or disputes arising from or relating to this agreement, any prior account agreement between us or the advertising, the application for, or the approval or establishment of the account(s) are also included.  Claims are subject to arbitration, regardless of what theory they are based on or whether they seek legal or equitable remedies. Arbitration applies

---

[2] The Coleys seem to insinuate that the signatures on the Agreement are not their signatures, noting that Commonwealth advanced an agreement "with signatures that purport to belong to the Coleys."  [R. 11 at 1.]  However, the Coleys have presented no evidence that they did not in fact sign the Agreement.

to any and all such claims or disputes, whether they arose in the past, may currently exist, or arise in the future.

*Id.* This provision then sets forth the sole exception to the arbitration provision which includes claims that meet the jurisdictional threshold for small claims court. *Id.*

Against that backdrop, the Coleys claims clearly fall within the scope of the arbitration provision. All of the Coleys claims against Commonwealth arise out of the purchase, financing, and repossession of the 2024 Ford Transit, which fall within the realm of disputes "arising out of or relating to the account(s)" the Coleys have with Commonwealth. *See id.* Furthermore, as noted above, Congress did not intend for the federal claims brought by the Coleys to be nonarbitrable. *See Green Tree*, 531 U.S. at 90; *Mason*, 806 F.Supp.3d at 710. Thus, with all of the Coleys claims falling within the scope of the arbitration agreement and subject to arbitration, the only remaining dispute is whether the Coleys agreed to arbitrate their claims against Commonwealth.

The Coleys advance three distinct theories as to why they have not agreed to arbitrate their claims against Commonwealth. First, they contend that the Retail Installment Contract assigned to Commonwealth by Gary Yeomans did not contain an arbitration clause, and because Gary Yeomans cannot assign more rights than it has itself, it could not assign the right to compel arbitration. [R. 11 at 5.] The relevance of this argument is not immediately clear because, by the Coleys' own admission, Commonwealth does not rely upon the Retail Installment Contract as the basis for its motion to compel arbitration. *Id.* at 1. Thus, while the Coleys correctly contend that Commonwealth may not invoke the Retail Installment Contract as the basis for compelling arbitration, Commonwealth has given no indication that it seeks to do so and moves only to compel arbitration on the basis of the Member Service Agreement.

Next, the Coleys contend that the Member Service Agreement is not properly supported by consideration because the Coleys did not have an existing a relationship with Commonwealth independent of the Coleys' relationship with Gary Yeomans. *Id.* at 5-6. Again, the relevance of this argument is unclear, and the Coleys have advanced no authority to support their claim that parties must have had prior dealings to render an arbitration agreement enforceable. Further, as noted above, the arbitration agreement itself is supported by consideration, simply by virtue of the parties equally giving up their right to proceed in a judicial forum in favor of an arbitral forum. *Energy Home*, 406 S.W.3d at 835 (quoting *Kruse*, 458 F.Supp.2d at 385). Additionally, the Member Services Agreement is otherwise independently supported by consideration. The Agreement extends all of the benefits of Commonwealth Federal Credit Union membership to the Coleys and governs disputes arising from those accounts and related services which suffices as consideration to support the validity of the Agreement.

Finally, the Coleys argue that Part One of the Agreement, which the Coleys signed, did not incorporate by reference Part Two of the Member Service Agreement, where the arbitration provision appears. [R. 11 at 6.] It is well settled under Kentucky law that "one writing can refer to another writing and incorporate the latter's contents into the contractual bargain" under the doctrine of incorporation by reference. *Univ. of Ky. v. Regard*, 670 S.W.3d 903, 912 (Ky. 2023) (citing *Dixon v. Daymar Colleges Grp., LLC*, 483 S.W.3d 332, 344 (Ky. 2015)). In order for a document to be incorporated by reference, "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms," and there must be "clear language expressing the incorporation of other terms and conditions." *Id.*; *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 8 (Ky. 2021).

13

In *Regard*, the Kentucky Supreme Court clarified the meaning of the second prong of the analysis, "clear language expressing the incorporation of other terms and conditions." 670 S.W.3d at 913. The Court noted that Kentucky courts have cited the Restatement (Second) of Contracts § 132 as authority for the elements of incorporation by reference. *Id.* Relevant here, comment c to § 132 provides:

> It is sufficient that the signed writing refers to the unsigned writing explicitly or by implication, or that the party to be charged physically attaches one document to the other or encloses them in the same envelope. Even if there is no internal reference or physical connection, the documents may be read together if in the circumstances they clearly relate to the same transaction and the party to be charged has acquiesced in the contents of the unsigned writing.

*Id.* (quoting Restatement (Second) of Contracts § 132, cmt. c). From this, the Kentucky Supreme Court held that "the law demands a clear reference to the document *being incorporated*," but the language *of incorporation* may be implied or inferred from the surrounding circumstances. *Id.* (emphasis in original).

In other words, in the instant matter, Part One of the Member Services Agreement must clearly refer to Part Two of the Member Services Agreement as the document being incorporated. However, whether Part One *sought to incorporate* by reference Part Two may be "entirely circumstantial" and can be inferred "without internal linguistic reference or even physical connection between the documents, so long as the documents clearly pertain to the same subject and the party to be charged has acquiesced to the contents of the unsigned incorporated document." *Id.*

Here, the Coleys only challenge the language *of incorporation,* not whether the Agreement contained a clear reference to the document *being incorporated*. Part One of the Member Service Agreement clearly and unequivocally refers to Part Two on several occasions, as well as where to locate Part Two, and the Coleys do not contend that the identity of the

14

document referred to is in doubt.  Thus, the Court only considers whether Part One sufficiently incorporated by reference Part Two of the Membership Services Agreement, such that the Coleys are bound by the terms of Part Two, despite only signing Part One.  Further, Part One does not explicitly state that it incorporates by reference Part Two, so the dispute turns on whether Part One impliedly incorporated by reference Part Two.

So long as the document to be incorporated is not in doubt, the Court looks to "mutuality of subject matter, and surrounding circumstances not inconsistent with the writings" to determine whether a document has been incorporated by reference.  *Regard*, 670 S.W.3d at 914.  At the outset, the Court notes that neither party provides any information regarding the manner in which Commonwealth presented the Member Service Agreement to the Coleys, so Commonwealth cannot rely upon the documents being physically attached to one another or offered as one document as the basis for incorporation by reference.  *See* Restatement (Second) of Contract § 132, cmt. c.  Notwithstanding, Part One and Part Two clearly relate to the same agreement and by signing Part One, the Coleys "acknowledge[d] receiving or being offered Part 2 of the" Member Service Agreement.  [R. 5-1 at 1.]  Additionally, the language preceding the Coleys' signatures specifically defines the Member Service Agreement as "the MSA Parts 1& 2" which clearly indicates that the documents are not separate contracts, but rather, two parts of the same contract.  *Id.*  Further, Part One is titled "Part 1" which necessarily implies the existence of additional parts to the document.

The Coleys attempt to argue that because Part One did not specifically reference an arbitration clause prior to their signatures, the arbitration clause is not enforceable, citing *Home Lumber Co. v. Appalachian Reg'l Hospitals. Inc.*¸722 S.W.2d 912, 915 (Ky. App. 1987).  *Home Lumber* states that "where no mention of the [arbitration] clause *or of terms and conditions*

15

*generally*, is included in the language that precedes the signature, the clause will be held unenforceable." *Id.* (emphasis added). While it is generally true that when a signature precedes terms of a contract, the parties are not bound by the terms that follow the signature, when a signature is placed after language incorporating other terms or documents by reference, "the signor agrees to be bound by everything incorporated." *Bartelt Aviation, Inc. v. Dry Lake Coal Co., Inc.* 682 S.W.2d 796, 797 (Ky. App. 1985) (citing *R.C. Durr Co., Inc. v. Bennett Industries, Inc.*, 590 S.W.2d 338 (Ky. App. 1979)).

The Kentucky Supreme Court confronted a similar, yet distinguishable scenario in *Dixon v. Daymar Colleges*. *See* 483 S.W.3d at 344-46. There, the plaintiffs signed only the first page of a two-page document, and notably, the arbitration provision was situated on the second page of the document. *Id.* at 345. The Court held that the plaintiffs had not assented to the arbitration provision because their signatures were prior to the arbitration provision, and the language of incorporation that preceded the signatures only incorporated "amendments" to the agreement. *Id.* The arbitration agreement, as a term in the original agreement, was not an amendment and thus was not clearly incorporated. *Id.* Further, the plaintiffs initialed a provision stating that they had *read* and *received* both pages of the agreement before signing it, but "simply acknowledging receipt of the document does not constitute assent to be bound." *Id.* at 346 (quoting *Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 456 (Ky. 2009)).

The instant Member Service Agreement stands on sounder footing. First, the Member Service Agreement is clearly defined as "the MSA Parts 1 & 2," so the arbitration provision is encompassed in the agreement terms. [R. 5-1 at 1.] Additionally, unlike *Dixon*, Part One does not simply state that the signor has "received and read" Parts One and Two; it states, "[b]y signing this Part 1. . .you agree to the MSA," which means that by signing Part One, the Coleys

16

assented to the entire Member Service Agreement—Parts One and Two.  *Id.*; *c.f Dixon*, 483 S.W.3d at 346 ("This provision is plagued by the absence of any language indicating that the [plaintiffs] actually assent to the terms referenced. . .Instead, the provision only indicates that the [plaintiffs] have *read* the terms.").  As such, Part Two of the Member Service Agreement was sufficiently incorporated by reference, and the Coleys agreed to the entire Member Service Agreement, including the arbitration provision in Part Two, by signing Part One.

Consequently, the Coleys' claims against Commonwealth Federal Credit Union are subject to arbitration.  The Coleys agreed to arbitrate claims arising out of their relationship with Commonwealth, all of their claims fall within the scope of that agreement, and Congress did not intend their federal claims to be nonarbitrable.  Accordingly, the Court will grant Defendant Commonwealth Federal Credit Union's Motion to Compel Arbitration as to all of the Coleys' claims.  [R. 5.]

**C**

As a final matter, both Defendants ask the Court to dismiss this action.  However, both Defendants erroneously rely on overruled case law as the basis for such request, so the Court will stay the proceedings pending the conclusion of the arbitration proceedings.  The Federal Arbitration Act provides that once a Court determines that the matter should be referred to arbitration, it "shall" stay the proceedings until the arbitration has ended, at which point the Court may confirm, vacate, or modify an award. 9 U.S.C. § 3; 9 U.S.C. §§ 9-11.  The Supreme Court of the United States recently resolved a circuit split over whether the district court may dismiss the action when all claims are subject to arbitration, holding that it may not.  *Smith v. Spizzirri*, 601 U.S. 472, 477 (2024) ("Here, as in other contexts, the use of the word 'shall' creates an obligation impervious to judicial discretion.")

17

Nevertheless, both Defendants ask the Court to dismiss this matter, citing a Sixth Circuit case that predates *Spizzirri* and directly conflicts with its holding. In *Green v. Ameritech Corporation*, the Sixth Circuit quoted, in dicta, the Fifth Circuit's then-applicable approach which provided that "the weight of authority clearly supports dismissal" when all issues must be arbitrated. 200 F.3d 967, 973 (6th Cir. 2000) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)). This holding cannot be squared with the Supreme Court's holding that upon the request of a party, the Court must stay the action, even when all claims are subject to arbitration. *Spizzirri*, 601 U.S. at 475-76.[3]

The Supreme Court reasoned that staying a suit rather than dismissing it accords with the "supervisory role" for the Courts, as contemplated by the Federal Arbitration Act. *Id.* at 478. The Act provides a mechanism for the Court to assist in arbitration in various ways, such as appointing an arbitrator, enforcing subpoenas, and enforcing an arbitral award. *Id.* (citing 9 U.S.C. §§ 5,7,9). Accordingly, leaving the case on the Court's docket allows it to step into this "potential ongoing role" as needed, without requiring the parties to initiate a new action if the Court's assistance becomes necessary throughout the course of arbitration. *Id.*

Even prior to *Spizzirri*, the Sixth Circuit rejected the reasoning of *Green*'s dicta and the out-of-circuit case it quoted. *See Arabian Motors Grp. W.L.L v. Ford Motor Co.*, 19 F.4th 938, 942 (6th Cir. 2021) ("[T]he Federal Arbitration Act is not a docket management statute. It is a statute that lays out a textual preference for arbitration, not cleaning out district court dockets."). The Sixth Circuit further reasoned that this interpretation is in line with federal policy favoring arbitration, for if the Court dismissed the case at this juncture, the aggrieved party could

---

[3] *Spizzirri* left open the possibility that a Court may dismiss an action "if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration." 601 U.S. at 476, n. 2. However, neither Defendant has provided the Court with an independent justification for dismissal beyond the arbitrability of all claims in the Coleys' Complaint.

18

immediately appeal, in contradiction of the Federal Arbitration Act. *Arabian Motors Grp. W.L.L v. Ford Motor Co.*, 19 F.4th 938, 942 (6th Cir. 2021) (noting that Section 16 of the Federal Arbitration Act allows immediate appeals of court order denying arbitration but defers appellate review of court orders directing arbitration until the confirmation stage of the case). Thus, despite this Court's finding that all of the Coleys' claims shall be arbitrated in accordance with the respective arbitration agreements, the Court must stay these proceedings until a final decision is reached in arbitration.

**III**

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant T. T. of F. Frankfort's Motion to Compel Arbitration **[R. 3]** is **GRANTED**;

2. The claims set forth in Plaintiffs' Complaint **[R. 1-1]** against T. T. of F. Frankfort are **REFERRED** to arbitration in accordance with the Vehicle Buyer's Order and Bill of Sale;

3. Defendant Commonwealth Federal Credit Union's Motion to Compel Arbitration **[R. 5]** is **GRANTED**;

4. The claims set forth in Plaintiffs' Complaint **[R. 1-1]** against Commonwealth Federal Credit Union are **REFERRED** to arbitration in accordance with the Member Service Agreement;

5. This matter is **STAYED** pending arbitration proceedings; and

6. Every ninety (90) days, beginning ninety (90) days after entry of this Order, the parties **SHALL** jointly file a status report on the status of arbitration.

This the 4th day of June, 2026.

Gregory F. Van Tatenhove
United States District Judge